# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

———————————————

### No. 201600309

———————————————

### UNITED STATES OF AMERICA
Appellee

v.

### CHRISTOPHER B. MEIERS
Hospital Corpsman Third Class (E-4), U.S. Navy
Appellant

———————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Colonel Peter S. Rubin, USMC.
Convening Authority: Commanding General, 2d Marine Division, Camp Lejeune, North Carolina.
Staff Judge Advocate's Recommendation: Lieutenant Colonel Winston G. McMillan, USMC.
For Appellant: Scott B. Jack, Esq.; Lieutenant Commander Jeremy J. Wall, JAGC, USN.
For Appellee: Commander James E. Carsten, JAGC, USN; Lieutenant Jetti L. Gibson, JAGC, USN.

———————————————

Decided 30 Jun 2017

———————————————

Before CAMPBELL, FULTON and HUTCHISON, *Appellate Military Judges*

———————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

———————————————

PER CURIAM:

At a fully contested general court-martial, officer and enlisted members convicted the appellant of stealing and selling military property worth more than $500.00—violations of Articles 108 and 121, Uniform Code of Military

Justice (UCMJ), 10 U.S.C. §§ 921 and 908 (2012). The members sentenced the appellant to one year and six months' confinement, reduction to pay grade E-1, a $10,000.00 fine, and a dishonorable discharge. The convening authority (CA) approved the sentence, as adjudged.

In his sole assignment of error, the appellant contends the sentence is inappropriately severe. He urges us to only affirm a sentence that includes "no more than 10 months of the 18 months of confinement . . . mitigates the [d]ishonorable [d]ischarge to a [b]ad[-c]onduct [d]ischarge[, and] disapproves the $10,000 fine[.]"[1] We conclude the findings and sentence are correct in law and fact and that no error materially prejudicial to the appellant's substantial rights occurred. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

To facilitate the practical-application training portion of local combat life-saving courses, some Camp Lejeune-area Navy Corpsmen, including the appellant, got permission to take expired or otherwise unserviceable field medical supplies—staged for Disposal Reutilization Management Office (DRMO) actions—to their commands from the installation Individual Issue Facility (IIF). The supplies were individual first-aid kit (IFAK) components previously issued to individual Marines, which were sorted into specific IIF containers as part of the formal gear-turn-in process. Upon their turn-in, unexpired IFAK components were placed into "red bins" for re-issue, expired components were placed into a Tri-Wall box about three feet from the red bins, and hazardous components were placed into nearby "gray totes."[2] The IIF warehouse manager testified that DRMO officials regularly inspected the containers to remove serviceable, unexpired items, and document items deemed appropriate for off-site disposal before removal:

> [O]nce the Tri-Wall was full or near full, my DRMO people would go through, [and] pull out anything that wasn't supposed to be in there. Then they will create and [sic] ETD [effective transfer date,] which is created t[h]rough the system from DRMO. Once the ETD is approved, we would take that Tri-Wall to a landfill.[3]

---

[1] Appellant's Brief of 11 Jan 2017 at 8.

[2] Record at 178.

[3] *Id.* at 179. In explaining the reference to "my DRMO people," the manager further testified, "I have two of my employees that are designated to take care of all of my DRMO. Anything that's unserviceable, that is expired, anything that doesn't meet our criteria to provide—going on our shelf for reusing." *Id.*

2

Instead of a formal issuance process for the combat life-saving course materials, an IIF contractor accompanied the corpsmen to the returned IFAK components containers area, allowed them to select items from the Tri-Wall, and leave with those training items based on an honor system. During February and March 2015, the appellant retrieved combat tourniquets, bandages, clotting gauze, chest seals, wound set kits, pressure dressings and water-jel packs from the IIF. The IIF employee with whom the appellant coordinated his visits testified that she did not constantly observe the corpsmen she escorted to the Tri-Wall box because the sorting containers were "at the end of our issue point" and "[s]ometimes there[ are] Marines there that ask questions and I turn my back."[4] She agreed, on cross-examination, with the trial defense counsel's assertion, "sometimes stuff that's not supposed to be in that Tri-Wall container, does end up in" there.[5]

On 23 February 2015, in a series of text messages, the appellant discussed selling "more tourniquets, pressure dressings, and combat gauze[,]" and specific available quantities, to an individual who, unbeknownst to him, was a Naval Criminal Investigative Service (NCIS) cooperating witness.[6] Days later, they agreed on $2,045.00 for the items. On 27 February 2015, the cooperating witness brought an undercover NCIS agent with him to meet the appellant at a location just off the military base, and introduced the undercover agent as the actual buyer. During the encounter, the appellant sold 275 combat tourniquets, 126 pressure dressings, 171 quick clot combat gauze kits, 94 chest seals, and 70 wound set kits for $2,045.00 in cash.

During March 2015, the appellant initiated two more sales with the undercover NCIS agent via text messages. Both sales occurred at the same meeting place as the initial February transaction, only the cooperating witness was no longer involved. On 3 March 2015, the appellant sold 100 tourniquets, 226 chest seals, and 284 quick clot combat gauze kits for $1,500.00 in cash. On 17 March 2015, during a "buy-bust operation,"[7] the appellant sold 33 quick clot combat gauze kits, 80 H bandages, 480 burn dressing kits, and 278 tourniquets for what he thought was $2,600.00 in cash before he was apprehended on site. NCIS seized an additional 25 quick clot combat gauze kits, 86 H pressure bandages, 57 cinch tights, 11 chest seals, and 73 combat tourniquets from the appellant's house.

---

[4] *Id*. at 192.

[5] *Id*. at 195.

[6] Prosecution Exhibit (PE) 15 at 1.

[7] Record at 147.

At trial, and without objection, trial counsel amended the approximate value alleged in the larceny specification from $200,000.00 to $77,000.00. The NCIS agent testified about the total larceny value based upon his review of a government price list, which was also admitted into evidence without objection as Prosecution Exhibit (PE) 23. In discussing how the agreed-upon purchase price of the items sold during the undercover operation was only $6,145.00, he explained that government property is normally resold at a fraction of its actual value, "kind of like a pawnshop value, used car value, something like that. When it's no longer brand new straight from the factory, it does not have the same value."[8] A Defense Logistics Agency employee testified that PE 23 was derived from the Federal Logistics Information Service, provides an item's price by its National Stock Number, and that all the items seized or bought from the appellant cost the government "between $75,000 and $100,000."[9]

Arguing that the government failed to introduce evidence of value for the larceny specification, the defense filed a motion for a finding of not guilty, pursuant to RULE FOR COURTS-MARTIAL 917, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). Part of the military judge's ruling included the following:

> Based on the amount the accused is alleged to have stolen and the prices as indicated in [PE] 23, the government has introduced some evidence that it was of a value greater than $500 as alleged, or at least of some value.
>
> Additionally, the government painfully walked each witness through each box, opened up, and showed at least some of those items were in the original packaging[,] which means that they are, according to testimony, allowed to be reused and ostensibly of the original value. All the witnesses also testified that the items contained in each box represent the ones they have up in [the consolidated issue facility]. Therefore, I find that the government has shown some evidence as to the value of the items alleged in Charge I[,] in [the sole] Specification. And the motion to dismiss is denied.[10]

As part of the findings instructions, the military judge instructed the members, without objection, about how they may determine value:

---

[8] *Id.* at 161.

[9] *Id.* at 160-61, 207-10.

[10] *Id.* at 217.

Value is a question of fact. The price listed in an official publication is evidence of its value at the time of the offense, provided the item was in the same condition as the item listed in the official price list. The price listed in an official price list does not necessarily prove the value of an item. In determining the actual value of the item you must consider all of the evidence concerning its condition in value. In determining the question of value, you should consider the testimony you have heard, the exhibits offered into evidence, and the condition of the items in evidence and all other evidence concerning the fair market value of the property described in the charges.[11]

## II. DISCUSSION

The appellant argues his "dishonorable discharge, a $10,000 fine and 18 months [of] confinement is inappropriately severe based on the individual circumstances of the case . . . ."[12] Part of those relevant case circumstances, he contends, includes an inflated value of the medical items—"the replacement value of brand new items"—being admitted without any clarifying instructions about how "these numbers did not adequately reflect the value of the property at the time of its theft and sale[,]" and the trial counsel's "factually incorrect" and "specious" sentencing argument that "the total value of these items, *if replaced by new ones, was $75,000!*"[13]

We review sentence appropriateness *de novo*. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006). "Sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves." *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988). This requires our "individualized consideration of the particular accused on the basis of the nature and seriousness of the offense and the character of the offender." *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (citation and internal quotation marks omitted). Despite our significant discretion in reviewing the appropriateness and severity of an adjudged sentence, we may not engage in acts of clemency. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

The appellant repeatedly abused his position as a corpsman to take government property for his own personal profit. He then purposefully and repeatedly initiated encounters with purchasers—unbeknownst to him, participants in an undercover operation. He further indicated his intent to

---

[11] *Id*. at 238; *see also* Appellate Exhibit X at 7.

[12] Appellant's Brief at 5.

[13] *Id*. at 7 (emphasis in original).

continue the scheme immediately before he was finally apprehended. We considered, and find unpersuasive, the appellant's contentions that the government's evidence[14] and arguments regarding the value of the larceny amount were improper. The adjudged confinement period was significantly less than the maximum possible—20 years of confinement—and the circumstances of the crimes make a dishonorable discharge and the adjudged fine part of the proper sentence components. With individualized consideration of the appellant, the nature and seriousness of his offenses, his record of service, and all the matters within the record of trial, we find the adjudged sentence appropriate.

### III. CONCLUSION

The findings and the sentence are affirmed.

For the Court



R.H. TROIDL
Clerk of Court

---

[14] We note that evidence of the 2015 transactions with the undercover agent included the appellant's own recorded and transcribed explanations that he sold fully serviceable, unexpired medical items: "I mean, they're all in good condition. I took all the ones out that were all unsealed or broken." PE 18 at 3. "I know most of [the gel packs] are, like, all the way out [sic] till 2019. The other, like, the majority are, like '18 to '19. . . . And then some are—or [a] few of them are the end of this year and some 2016 and stuff. But for the most part when I was spot-checking them, the majority of them were pretty far out there." PE 19 at 2.